## J. H. ALTENDORF v. JOHN HOGENSON, *d. b. a.* HOGENSON CONSTRUCTION COMPANY.[1]

June 22, 1945.

No. 34,024.

*Gleason, Ward & Orff* and *Arthur H. Lindeman,* for appellant. *Best, Flanagan, Rogers, Lewis & Simonet,* for respondent.

MAGNEY, JUSTICE.

Plaintiff brought an action for an accounting. John Hogenson, doing business as Hogenson Construction Company, defendant herein, was engaged in the business of constructing grain elevators, and plaintiff was in his employ. The court found for plaintiff, and judgment was entered on the findings. Defendant appeals from this judgment.

The record is voluminous, 1,174 pages, and there are numerous exhibits. This, of course, is the usual situation in accounting cases. The questions involved are purely those of fact, and our decision will be of no value as a precedent. It is therefore desirable to consider and dispose of the questions presented to us in as complete a manner as possible consistent with brevity.

Plaintiff was employed about January 1, 1936, to work in defendant's office in Minneapolis. He claims that on or about February 15, 1940, he and defendant, together with W. E. Melena and John S. Van Nice, two other employes of defendant, entered into an agree-

[1]Reported in 19 N. W. (2d) 430.

ment under which the three employes were to receive $175 per month commencing January 1, 1940, their expenses for travel, and four cents per mile for car allowance; that defendant was to receive $5,000 per year, was to furnish the necessary money to carry on the business of constructing and repairing elevators, and for such financing was to receive all cash discounts on material purchased; that after the salaries of all four parties, the traveling expenses and car allowances, and all other expenses of the business had been deducted from the income, the net profits remaining were to be divided in four parts—25 percent to each of the parties mentioned. No written memorandum of the agreement was made, and there was no understanding as to how long this arrangement was to continue. Defendant denies that such an agreement was entered into. He claims that he had agreed to pay plaintiff and other employes a bonus at the end of the year in such an amount as the profits for the year would permit. He specifically denies that he agreed to pay them 25 percent of the net profits. The court found the arrangement to be as contended for by plaintiff. We have examined the record and have concluded that on the conflicting testimony presented the finding of the court is sustained by the evidence. No useful purpose will be served by analyzing in detail the lengthy testimony on the question. Plaintiff continued to work for defendant until about February 23, 1943.

The remaining questions involve consideration of numerous items which have a bearing in the determination of the net profit of defendant during 1940, 1941, and 1942.

The court found that the net profit for 1940 was $14,414.81. Defendant contends that the correct amount is $14,131.81. The only item in the 1940 accounting as found by the court which defendant specifically questions is a sum of $82.79, which he claims plaintiff was overpaid in 1939. This matter was not raised in the pleadings, during the trial, or in the motion for amended findings. It will not be considered here.

One of the provisions in the contract between plaintiff, the two other employes, and defendant was to the effect that defendant

would furnish the necessary money to carry on the business, and for such financing he was to receive all cash discounts on material furnished. Certain equipment was purchased from R. R. Howell Company. As this company had no sales representative in the territory in which this equipment was sold, it allowed a special five percent trade discount. Defendant was entitled to all cash discounts. This was not a cash discount. The court was right in finding that defendant was not entitled to it.

One W. F. Clapp was a foreman in defendant's employ. In March 1943, a check for $1,000 was given to him. It was dated back to December 31, 1942. This check was to cover the amount of bonus set up for Clapp for the year 1942. Clapp refunded to defendant $500 out of the proceeds of the check. Defendant testified:

"* * * I told him to give me back a check for $500 to guarantee that he would work for me for the balance of the year [1943] * * *.

\* \* \* \* \*

"Q. And you held that to the end of 1943, John?

"A. To the end of 1943 to guarantee he would work for me for the balance of the year."

The court found that Clapp had been properly paid a bonus of $500 for work done in 1942. Under defendant's own testimony as to the arrangement, the court was right in refusing to charge to the 1942 business the $500 which defendant withheld conditionally upon Clapp's remaining in his employ during 1943.

In 1942, defendant did work for Whelan Bros. Elevator Company. On December 31, 1942, this account, amounting to $560.43, was charged off as a bad debt and deducted from the 1942 profit. On December 27, 1943, it was paid in full. The court held that, inasmuch as the account was collectible at the time it was charged off as a bad debt and was for work done in 1942, the amount should not be deducted from 1942 profits. In our opinion the court was correct.

Defendant complains of the fact that the court refused to allow a setoff of $1,900 to cover the probable cost of repairing and adjusting an elevator at Minot, North Dakota, which had been constructed by defendant. The elevator company had requested an adjustment. But on December 13, 1943, defendant received a letter from the company from which the trial court determined that it had abandoned its previous claim. The manager of the elevator company wrote: "I am sorry that I said anything about this without looking at the plans." The evidence justified the court's finding.

On December 31, 1942, an item of $2,500 was set up as a reserve for replacements and adjustments on completed jobs. The evidence disclosed that up to May 15, 1944, the date of commencement of the trial, defendant actually had spent $1,979.62 for replacements and adjustments. The court added the balance, amounting to $520.38, to the net profit as shown by the annual audit report. Defendant contends that the balance should have been held in abeyance until further accounting in the action. The trial court had set aside other reserves, and it did not appear to it to be necessary to retain the $520.38 as a reserve in the particular contract involved. It was within the good judgment of the court.

A secondhand feed mill was purchased by defendant in 1942 for $514. On December 31, 1942, it was written off as worthless. The amount had been deducted by the accountants from the profits of the company. The mill was still in the possession of defendant. The trial court found that the mill had a value of $462.60 at the time of trial. Defendant said he would be willing to sell the mill for what he had in it. He was asked:

"And you do not feel that you should or will necessarily have to take a loss on the mill; is that a fact?

"A. I would not sell it if I had to take a loss on it."

Apparently it was charged off for income tax purposes. Defendant testified that he would consider whatever he would sell it for as a part of the income for the present period. The court was right in

adding the value of the mill to the net profit as shown by the 1942 annual audit.

On February 25, 1942, defendant entered into three contracts for the construction of three grain elevators for the Pendleton Grain Growers Association of Oregon. They were cost plus contracts. Defendant had commenced the construction of one of these elevators at Umatilla. He was a nonunion operator. Two or three days after he commenced work labor troubles developed. A picket line was thrown around his job. The labor unions demanded of defendant and the association that the work be done by union labor. At that time defendant had other operations in Oregon and Washington under straight contracts, not cost plus. These contracts aggregated $160,000. If defendant agreed to use union labor on his contracts with the association, he would be compelled to use union labor on all his other operations. The union scale was considerably higher than what he was paying, and he was convinced that he would lose money if he had to pay on a union-scale basis. The union threatened to picket all the elevators of the association if the new elevators were constructed on a nonunion basis. The association was willing that the work be done by union labor, and, as defendant had cost plus contracts, it would not affect him adversely. If the union scale increased the cost, the amount he would receive would also increase. But he thought his losses on the other contracts would be too great. The union did agree to permit defendant to construct the straight contract jobs on a nonunion-scale basis, because of his contract obligations, if he would have nothing to do with the association jobs. Defendant had a brother, Ben, who lived at Belmond, Iowa. Ben had worked for defendant and had also been an independent contractor. He was experienced in the construction of elevators. Ben had just had financial reverses. An involuntary petition in bankruptcy had been filed against him, and he was not at that time engaged in any work. Defendant told the officers of the association about Ben and suggested that Ben take over the contracts and construct the elevators with union labor. Defendant called up Ben by telephone at Belmond, Iowa, and ad-

vised him of the situation. Ben came out to Oregon on March 21, 1942. When Ben arrived in Oregon, new contracts were signed between the association and Ben. They were dated back to February 25, 1942, the date when the original contract was entered into with defendant. The contracts which the association entered into with defendant and Ben were identical except for the words, "Hogenson Construction Company of Belmond, Iowa," which were substituted for the words "Hogenson Construction Company of Minneapolis." Ben and the union representatives then entered into a contract, and the labor difficulties were over. There was no writing that the association or defendant released each other from the terms of the original contracts, and no writing between Ben and defendant as to their arrangements. Plaintiff contends that the new arrangement with Ben was simply a blind, and that defendant in fact continued as the contractor for the construction of the elevators for the association, and that he, plaintiff, is entitled to his share in the profits. Defendant insists that, after the contracts were entered into with Ben, plaintiff no longer had any interest in those jobs; that from then on they were Ben's projects. The court found that they were, and continued to be, defendant's contracts, and allowed plaintiff a share in the profits.

Considerable material had been ordered for and delivered to the Umatilla job by defendant. Ben proceeded with the construction of the three elevators. In about six weeks he became seriously ill with appendicitis and left Oregon on May 11, 1942, going to Minneapolis and then to Rochester for treatment. He never came back. Before he left Pendleton, Oregon, he placed all jobs under the supervision of W. F. Clapp, who had been in the employ of defendant for a number of years. Ben testified that defendant said he would look after the contracts for him from then on.

When Ben arrived in Oregon, he had been out of work, was penniless, had no equipment or building material, and had no credit. He was permitted to draw $400 per month for living expenses. During the six or seven weeks he was in Oregon, he drew $1,374.92. A separate set of books was set up in the office of the

Hogenson Construction Company of Minneapolis in connection with the contracts with the association. The receipts and disbursements were handled in a manner different from that of defendant's other contracts. The money was deposited in and withdrawn from the personal checking account of defendant in Minneapolis and a checking account in the Pendleton branch of the United States National Bank of Portland, Oregon. Ben had no authority to draw a check on any account. The checking account in Oregon was in the name of Hogenson Construction Company of Minneapolis. Ben had made out no signature card. Work progressed under the direction of foremen who had been employed by defendant for years. No one on the Oregon jobs had ever worked for Ben. All the equipment used on the jobs was the property of the Hogenson Construction Company of Minneapolis. Materials and supplies were ordered through the Minneapolis office. After defendant took over, he bought materials for the jobs. The final statement was rendered by the Hogenson Construction Company to the association. The payments were made to the Hogenson Construction Company of Minneapolis. As has been stated, Ben drew $1,374.92 while in Oregon. On page 19 of the account book for the association jobs, under date of July 31, 1942, we find the following entries:

|  |  |  | "Dr. | Cr. |
|---|---|---|---|---|
| "Ben | Hogenson | Meals | $107.94 | $107.94 |
| " | " | Mileage | 177.92 | 177.92 |
| " | " | Hotel & Phone | 228.10 | 228.10 |
| " | " | Salary | 600.00 | 600.00 |
| " | " | Traveling | 134.92 | 134.92 |
|  |  |  | "[$1,248.88 | $1,248.88]" |

The book entries thus indicate an overdraft of $126.04. On August 1, 1942, the Hogenson Construction Company purchased an automobile from Ben for $550. On the same day it issued its check for $423.96 in payment of the car. This check, together with the $126.04 overdraft shown by the book entries, equals the purchase price of

the car. In the books, under the heading "Tools and Equipment," the car is designated as "Pickup." During the progress of the work, letters were addressed to the Pendleton Grain Growers (the association), signed Hogenson Construction Company, by John Hogenson. They were on letterheads of the Hogenson Construction Company. Statements were made out on similar letterheads. On February 5, 1943, the association wrote a letter to defendant enclosing a check for $2,037.12, which, "according to your last statement, is the balance due you on the construction which you did for us during 1942."

Defendant and Ben testified that under agreement between them defendant did receive $5,500 for his work in completing the association contracts. Also, that defendant reimbursed himself $3,500, the amount of a note given to him by Ben dated December 13, 1935. The court did not allow the payment of this note as a credit against the 1942 earnings of the Hogenson Construction Company. There were so many discrepancies and contradictions in the testimony offered in behalf of defendant, particularly that given by Ben himself, that the trial court was justified in disbelieving a substantial part of it. The total profit on the jobs was $12,767.96. Without going into the details of defendant's testimony as to how Ben was paid his share by defendant, it is sufficient to say that the character of the testimony was such that the court was amply justified in disbelieving it. For example, defendant said that part of the payment was by a check for $200 dated May 10, 1943, issued by defendant personally to Ben. The personal account book shows this check with a notation "Miscellaneous expense." This is also true of a check for $100 dated July 8, 1943. In addition, this latter check had a notation "expense" in the upper left-hand corner.

On such evidence as we have detailed, the court's finding that defendant was the actual contractor in the construction of the projects for the association is sustained.

Defendant, as Hogenson Construction Company, had a contract with The Port of The Dalles, Oregon, for construction of certain structures. The job was not completed in 1942. The auditor

showed a profit on this and other jobs of $20,089.97 and that the jobs were 82.1 percent completed at the end of year 1942. Such percentage of the profit amounted to $16,493.60. The Port of The Dalles objected to some of the items in its account amounting to $9,256.26. In order to protect defendant, the court deducted the entire amount of the disputed claim from the $20,089.97, leaving a balance of $10,833.71 for the gross profit billed by the Hogenson Construction Company in 1943 for work under construction on December 31, 1942. Plaintiff was entitled to participate in 82.1 percent of the profit, and the court added $8,894.21 to the 1942 earnings, in which the court held $7,599.39 in reserve. The court protected defendant by setting up the reserve. We think there was no error in so doing.

Defendant contends that during the last year of plaintiff's employment he was negligent in his duties in that he failed to pay statements within the time allowed for the taking of cash discounts, and defendant counterclaims for his claimed losses by reason thereof. On conflicting testimony, the court found that plaintiff was not negligent. The evidence supports this finding.

There are some additional claimed errors. We have examined them and find no basis for the claims that the court erred in those matters.

The findings of the court are sustained by the evidence, and the judgment is affirmed.

Affirmed.